# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DEBRA A. VITAGLIANO,<br><br>     *Plaintiff,*<br><br>  v.<br><br>COUNTY OF WESTCHESTER;<br><br>GEORGE LATIMER, in his official capacity as County Executive of the County of Westchester;<br><br>– and –<br><br>JOHN M. NONNA, in his official capacity as County Attorney of the County of Westchester,<br><br>     *Defendants.* | Case No. 7:22-cv-09370<br><br><br>**COMPLAINT**<br><br><br>**DEMAND FOR JURY TRIAL** |

## NATURE OF THE ACTION

1.  If the right to free speech includes anything, it includes the right to engage in peaceful, face-to-face conversations on important matters in a public forum. Yet that is exactly what Westchester County has banned—prohibiting citizens from approaching others in public fora near an abortion clinic to peacefully discuss and distribute pamphlets and literature about alternatives to abortion, unless they first obtain consent.

2.  Plaintiff is a Westchester County resident who believes in the dignity of all human life, including the unborn. She seeks to stand on the public way outside of a White Plains abortion clinic, approach women entering the clinic, and initiate gentle,

1

compassionate conversations about the woman's situation and resources available should she decide to carry her child to term. Such conversations can be successful; indeed, in Plaintiff's experience most women who consider abortions do so only because they feel that they have no viable alternative and that no one cares about them.

3. Yet Westchester County does not want women to have this final opportunity to make a more fully informed choice. In June 2022, the County passed a new law that makes it illegal, within 100 feet of an abortion clinic, to "knowingly approach" within eight feet of another person to speak or distribute literature, "unless such other person consents."

4. The ban is content-based on its face—it applies only if the approach is "for the purpose of passing any material, item, or object to, displaying a sign to, or engaging in oral protest, education, or counseling" with the other person.

5. And the ban is not even related to, much less necessary for, maintaining clinic access or avoiding violence. To the contrary, the new law includes eight other overlapping subsections prohibiting every conceivable way in which a person could block access to a clinic or engage in violence near one, to say nothing of the numerous other applicable federal and state laws.

6. Instead, Defendants seem to have banned sidewalk counseling simply because the Supreme Court said they could, in a 2000 decision upholding a materially identical law in Colorado. *Hill v. Colorado*, 530 U.S. 703 (2000). Yet *Hill* was wrong the day it was decided, as the dissenting Justices explained. Its core legal premises have been expressly rejected in the Court's intervening cases. It has been subjected to withering

academic criticism, from all sides of the spectrum. And most recently, a majority of the Court recognized it as a "distort[ion]" of ordinary "First Amendment doctrines." *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2276 & n.65 (2022).

7. *Hill* reflects how the Court, having once "deprived abortion opponents of the political right to persuade the electorate that abortion should be restricted by law," erroneously permitted governments to take away "their individual right to persuade women contemplating abortion" to make a different choice. *Hill*, 530 U.S. at 741-42 (Scalia, J., dissenting). The Court has fixed the first problem. *See Dobbs*, 142 S. Ct. 2228. It is time to fix the second. Plaintiff's First Amendment rights have been violated, and she is entitled to relief.

## JURISDICTION AND VENUE

8. This action arises under the Constitution and laws of the United States. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343.

9. The Court has authority to issue the declaratory and injunctive relief sought under 28 U.S.C. §§ 2201 and 2202.

10. Venue lies in this district under 28 U.S.C. § 1391(b)(1) and (2).

## PARTIES

11. Plaintiff Debra Vitagliano is a United States citizen and resident of Port Chester, New York, in Westchester County.

12. Defendant County of Westchester is a duly incorporated county of the State of New York. A Westchester County law is the subject of this suit.

13. Defendant George Latimer is the County Executive of the County of Westchester. Defendant Latimer signed the challenged provision into law and is responsible for its enforcement. He is sued in his official capacity.

14. Defendant John M. Nonna is the County Attorney for the County of Westchester. The County Attorney is authorized in the challenged law to bring civil actions enforcing it. He is sued in his official capacity.

## FACTUAL ALLEGATIONS

### *Plaintiff's speech*

15. Plaintiff is an individual who—motivated by her belief in the inherent dignity of all human life—wishes to peacefully approach women entering abortion clinics and speak with them about alternatives to abortion. The County's law renders her a criminal, and subjects her to severe civil penalties, if she does so.

16. Plaintiff Debra Vitagliano is 64 years old and a mother of three.

17. Debra has worked as an occupational therapist for 42 years. She discerned this vocation at a young age after seeing a little girl using Lofstrand crutches on an Easterseals "Child of the Year" poster. Debra told herself that she wanted to work with children like that.

18. Debra primarily works with special needs children. Early in her career, her caseload was full of children diagnosed with spina bifida, hydrocephalus, Down syndrome, amelia, and various neurological disorders. In recent years, Debra has seen a

significant decrease of these types of disorders in the children she treats. She believes

this is a result of abortions of children prenatally diagnosed with these conditions.[1]

19. Debra's work with special needs children has led her to see the inherent worth

and dignity of all people, no matter their level of functioning.

20. Debra is a devout, practicing Catholic. Her religious beliefs are sincere and

meaningful; they are the foundation of her life.

21. The Catechism of the Catholic Church teaches that life begins at conception

and that abortion is "gravely contrary to the moral law." Catechism of the Catholic

Church ¶¶ 2270-71.

22. Consistent with her Catholic faith, Debra opposes the practice of abortion, be-

cause she believes it is the deliberate destruction of innocent human life.

23. Two years ago, Debra felt called spiritually to live out her faith by getting in-

volved with the pro-life movement.

24. In February 2021, Debra began participating in a peaceful prayer-vigil cam-

paign at the Planned Parenthood in White Plains, New York.

25. At the outset of her participation, Debra reviewed materials from organizers

that provide guidance for safe, lawful prayer vigils. These materials instruct

---

[1] *See, e.g.*, Candice Y. Johnson et al., *Pregnancy Termination Following Prenatal Diagnosis of An-encephaly or Spina Bifida: A Systematic Review of the Literature*, 94 Birth Defects Rsch. 857 (2012), https://onlinelibrary.wiley.com/doi/10.1002/bdra.23086; Stina Lou et al., *Termination of Pregnancy Following a Prenatal Diagnosis of Down Syndrome: A Qualitative Study of the Decision-Making Process of Pregnant Couples*, 97 Acta Obstetricia et Gynecologica Scandinavica 1228 (2018), https://ob-gyn.onlinelibrary.wiley.com/doi/epdf/10.1111/aogs.13386; Mary O'Callaghan, *Teaching Human Dignity: Prenatal Diagnosis & Disability Selective Abortion,* McGrath Inst. for Church Life (2019), https://perma.cc/XS8Y-JYA3; Sarah Zhang, *The Last Children of Down Syndrome*, The Atlantic (Nov. 18, 2020), https://perma.cc/SPC8-MVXY.

participants to obey all laws and not to trespass, threaten, touch others, display or discuss weapons, curse, or block anyone's path or right-of-way.

26. As part of the campaign, Debra engaged in prayer vigils, where she would stand and peacefully pray on the sidewalk and other portions of the public way outside the White Plains Planned Parenthood. At times she held signs that read, "Women Do Regret Abortion," "Men Regret Lost Fatherhood," and "Pray to End Abortion." Debra complied with the guidance she reviewed, making sure to remain on the public right-of-way and not to trespass or obstruct any lawful passage.

27. Some campaign participants engaged in sidewalk counseling, approaching women on their way into Planned Parenthood, speaking with them, and distributing pamphlets and other literature.

28. Debra felt called to engage in sidewalk counseling. She views it as a final attempt to turn pregnant women's hearts away from abortion and to save innocent unborn lives. She feels women who seek abortions are not fully informed of the procedure and their options. She wants to educate women on abortion, inform them of alternatives, and advise them of services and resources available to them if they carry their babies to term.

29. Debra did not immediately engage in sidewalk counseling because she felt she first needed proper training. She wanted to learn methods and techniques for approaching pregnant women, ideas for what to say to them, and how to handle the many different circumstances she may encounter.

30. Debra registered for and completed multiple online classes—one introductory course, and one advanced course lasting eight weeks—on consulting pregnant women at risk of abortion. She planned to use the knowledge she gained in the classes to engage in sidewalk counseling and to volunteer at crisis pregnancy centers.

31. In spring 2022, Debra requested and received pamphlets from local organizers, which she planned to distribute while engaging in future sidewalk counseling.

32. Upon completing her training courses, Debra signed up to volunteer as a "life consultant" at a crisis pregnancy center. Life consultants meet virtually one-on-one with women experiencing unplanned pregnancies and consult with them about their options and services available to them if they decide to carry their babies to term.

33. Debra first shadowed life consultants in their consultations at an in-person crisis pregnancy center so she could see in action the training she received in her classes. She observed pregnant women so grateful for help. One pregnant woman previously had an abortion and did not want to have another one but needed support. Another woman, who had no family in this country except her fiancé, cried joyfully in the consultation room because the life consultants were so helpful to her.

34. Debra now volunteers as a virtual life consultant for two hours each week.

35. Now properly trained and with experience as a life consultant, Debra is prepared to engage in sidewalk counseling. Debra would like to counsel women on the public way as they approach the White Plains Planned Parenthood.

36. Consistent with her training, she seeks to explore a woman's pregnancy issue and the details of her story by active listening and learning. She would ask about the

woman's needs, strengths, and areas of awareness (feelings, thoughts, wants, values, and beliefs), as well as the attitudes, feelings, and responses of the woman's parents and the unborn child's father.

37. Debra intends to begin her conversations outside the clinic by approaching a woman and saying, "You are not alone. We can help you" (or language to similar effect). She would inform the woman that there are people who will be there to love and care for her and her child should she carry the child to term, and she would seek to learn from the woman what in her life was leading her to consider abortion.

38. It is critical to Debra's ministry that she pay close attention to the woman's every word and body language, ask open-ended questions, interpret what she believes she is hearing, and observe and listen for contradictions and ambivalence to understand more deeply. Given the sensitivity of the discussion, and the need for close attention and eye contact to establish trust, Debra would need to approach within eight feet and within arm's reach to initiate her conversations and to distribute pamphlets, which is a distance that in any event Debra would view as normal for talking in a noisy public space. (The White Plains Planned Parenthood is located just off a busy, four-lane highway, near an exit ramp from the Cross Westchester Expressway.)

39. Debra would of course cease approaching if asked. But she could not begin by seeking permission to approach. Such a request would cut into her valuable window to communicate, would be easily ignored, and would undermine her message.

40. Next, Debra would share with the woman information about other options she might wish to consider. She would draw from her personal experiences as a mother and, if appropriate, as an occupational therapist.

41. Debra would then seek to offer the woman a vision for a fuller life and help the woman to value herself and her unborn child differently. Debra would tell the woman that she is made in the image and likeness of God, and that God loves her and even died for her.

42. Debra would also seek to empower the woman to choose life. She would offer her a pamphlet that contains information for services and resources available to the woman if she carries her baby to term.

43. Before she could begin putting her training into practice by sidewalk counseling, Westchester County passed the law at issue in this litigation.

### The County's Sidewalk Counseling Ban

44. In June 2022, Westchester County banned Plaintiff from engaging in sidewalk counseling by making it illegal to approach a woman entering an abortion clinic to engage in peaceful, gentle, and caring conversation about alternatives to abortion.

45. In particular, on June 27, 2022, the Westchester County Board of Legislators voted to enact the "Reproductive Health Care Facilities Access Act," adding Chapter 425 to the Laws of Westchester County. Defendant Latimer, the County Executive, signed the new Chapter 425 into law the next day.

46. Section 425(*i*) of the Laws of Westchester County—hereafter, the "Sidewalk Counseling Ban"—now reads as follows:

It shall be unlawful for any person to do the following:

i. knowingly approach another person within eight (8) feet of such person, unless such other person consents, for the purpose of passing any material, item, or object to, displaying a sign to, or engaging in oral protest, education, or counseling with such other person in the public way within a radius of one-hundred (100) feet from any door to a reproductive health care facility.

47. "Approach" is defined as "to move nearer in distance to someone." Laws of Westchester County § 425.21(a). "Reproductive health care facility" is defined as "any building, structure, or place, or any portion thereof, at which licensed, certified, or otherwise legally authorized persons provide reproductive health care services," with "reproductive health care services" in turn defined to include "services relating to pregnancy or the termination of a pregnancy." *Id.* § 425.21(k)-(l).

48. Violations of the Sidewalk Counseling Ban are misdemeanors punishable by fines and imprisonment. "[F]or a first conviction" a sidewalk counselor can be forced to pay a fine of up to $1,000 and be imprisoned for up to six months. Subsequent convictions are punishable by fines up to $5,000 and imprisonment of up to one year. *Id.* § 425.41(a)-(b).

49. The law also permits civil actions by abortion clinics, abortion-clinic employees, and their "invitee[s]," authorizing treble damages for, *inter alia*, "pain and suffering, psychological, and emotional distress damages … suffered as a result of" violations. *Id.* § 425.51. It further authorizes civil enforcement actions by the County Attorney "for injunctive and other appropriate equitable relief in order to prevent or cure a violation." *Id.* § 425.61.

### *The impact on Plaintiff's speech*

50. The Sidewalk Counseling Ban prohibits Plaintiff's ministry of sidewalk counseling, by banning the close approach it—or any other normal conversation—requires.

51. Plaintiff's sidewalk-counseling ministry depends on initiating conversations at the time at which women are most focused on their abortion decision—as they are on their way into the clinic. Yet the Sidewalk Counseling Ban's 100-foot radius encompasses the entire public sidewalk in front of the White Plains Planned Parenthood, and reaches well into the street on either side of the driveway leading into the clinic's parking lot. Plaintiff's intended ministry would take place within the 100-foot radius. She cannot effectively reach at-risk women if she is forced to remain outside the 100-foot radius.

52. Thus, if Plaintiff wanted to engage in her ministry of discussing abortion with women at the time they may need her support most, Plaintiff could either (a) raise her voice at women from eight feet away; or (b) ask for explicit permission before approaching for a conversation at normal range.

53. Yet Plaintiff seeks to discuss abortion and abortion alternatives with women in a loving, caring manner, making eye contact and listening carefully to the woman's own motivations and concerns. Such conversations cannot be conducted at a shout, but rather require close proximity and a gentle tone of voice. It is essential to Plaintiff's ministry that these conversations be conducted within eight feet and within arm's reach. This is so for numerous reasons—for Plaintiff's message of compassion and support to be effectively conveyed, for Plaintiff to accurately discern the woman's

position, for the conversation to be respectful of the woman's privacy, and for Plaintiff to hand the woman a pamphlet or other literature about alternatives to abortion and resources available to her if she carries her baby to term.

54. Nor can the problem be solved by requesting explicit consent to approach. Such a request is easily ignored—especially when voiced from eight feet away or when the woman is arriving at the clinic by car. Meanwhile, Plaintiff believes that women are more likely to respond positively—and seek more information and come to a more informed decision—when the first words they hear from a counselor consist of a loving message of sympathy and support.

55. The Sidewalk Counseling Ban is content-based on its face. The consent requirement applies only if a speaker's speech includes certain categories of content—"protest, education, or counseling." If a speaker wishes to approach a woman to engage in speech of any other content—say, to take a poll, solicit donations, or ask for directions—she is free to do so.

56. The Board of Legislators committee report states that the Sidewalk Counseling Ban was justified to "maintain a person's right to safely access" abortion clinics and "avoid the potential for physical confrontation."

57. Yet the Sidewalk Counseling Ban is not limited to actions that impede "access" or threaten violence. Rather, it prohibits peaceful, one-on-one conversations on an issue of great public concern, which lie at the heart of the First Amendment.

58. Moreover, the committee report identified only one prior incident at a Westchester abortion clinic that supposedly motivated passage of the law: a

November 2021 trespassing where a Catholic priest and two other pro-life advocates entered a White Plains abortion clinic and remained inside for two hours, despite requests to leave from staff and police.

59. Yet that incident—which occurred *inside* the abortion clinic, rather than on the public right-of-way—was addressed under preexisting criminal trespass law, with the advocates being convicted and sentenced to jail time for their actions.

60. Further, the Sidewalk Counseling Ban is simply one of many restrictions addressing activities near abortion clinics adopted in Chapter 425. The law independently prohibits, *inter alia*, obstructing access; violence and any other unwanted physical contact; following and harassing; threats and intimidation; and "interfer[ing] with" (or attempting to interfere with) an abortion clinic's operations.

61. Indeed, the Sidewalk Counseling Ban is the last subsection of Section 425.31. The remainder of that section reads as follows:

> Sec. 425.31. Prohibited conduct.
>
> It shall be unlawful for any person to do the following:
>
> a. knowingly physically obstruct or block another person from entering into or exiting from the premises of a reproductive health care facility or a public parking lot serving a reproductive health care facility, in order to prevent that person from obtaining or rendering, or assisting in obtaining or rendering, medical treatment or reproductive health care services; or
>
> b. strike, shove, restrain, grab, kick, or otherwise subject to unwanted physical contact or injury any person seeking to legally enter or exit the premises of a reproductive health care facility; or
>
> c. knowingly follow and harass another person within twenty-five (25) feet of (i) the premises of a reproductive health care facility or (ii) the entrance or exit of a public parking lot serving a reproductive health care facility; or

d. knowingly engage in a course of conduct or repeatedly commit acts when such behavior places another person in reasonable fear of physical harm, or attempt to do the same, within twenty-five (25) feet of (i) the premises of a reproductive health care facility or (ii) the entrance or exit of a public parking lot serving a reproductive health care facility; or

e. by force or threat of force, or by physically obstructing or blocking, knowingly injure, intimidate, or interfere with, or attempt to injure, intimidate, or interfere with, another person in order to discourage such other person or any other person or persons from obtaining or providing, or assisting in obtaining or providing, reproductive health care services; or

f. by force or threat of force, or by physically obstructing or blocking, knowingly injure, intimidate, or interfere with, or attempt to injure, intimidate, or interfere with, another person because such person was or is obtaining or providing, or was or is assisting in obtaining or providing, reproductive health care services; or

g. physically damage a reproductive health care facility so as to interfere with its operation, or attempt to do the same; or

h. knowingly interfere with the operation of a reproductive health care facility, or attempt to do the same, by activities including, but not limited to, interfering with, or attempting to interfere with (i) medical procedures or treatments being performed at such reproductive health care facility; (ii) the delivery of goods or services to such reproductive health care facility; or (iii) persons inside the facility[.]

62. Moreover, numerous other federal and state laws address violence or obstructive conduct at abortion clinics, without prohibiting Plaintiff's intended speech.

63. The Freedom of Access to Clinic Entrances (FACE) Act, for example, makes it a federal crime to, "by force or threat of force or by physical obstruction," intentionally injure, intimidate, or interfere with abortion-clinic patients and providers. 18 U.S.C. § 248(a)(1). New York has a statutory analogue to the FACE Act. N.Y. Penal Law § 240.70. New York law likewise prohibits entering the property of another (including an abortion clinic) without permission, subjecting that conduct to both civil and criminal penalties. *Id.* § 140.10; *see Long Island Gynecological Servs. v. Murphy*, 298

14

A.D.2d 504, 748 N.Y.S.2d 776 (2d Dep't 2002) (affirming permanent injunction for trespassing at abortion clinic). And New York has generally applicable criminal statutes forbidding, *inter alia*, assault, N.Y. Penal Law § 120.00, harassment, *id.* §§ 240.25-26, and disorderly conduct, *id.* § 240.20.

64. Despite her earnest desire to engage in sidewalk counseling outside the White Plains Planned Parenthood, Plaintiff has not done so because of the Sidewalk Counseling Ban.

65. But for the Sidewalk Counseling Ban, Plaintiff would engage in sidewalk counseling.

66. Plaintiff has been—and, absent injunctive relief, will continue to be—irreparably harmed by the Sidewalk Counseling Ban, because of the chilling of her constitutionally protected speech.

### *Legal background*

67. According to the committee report recommending its adoption, the Sidewalk Counseling Ban was based on a Colorado statute upheld by a divided Supreme Court in *Hill v. Colorado*, 530 U.S. 703 (2000). The Sidewalk Counseling Ban is materially identical to the law at issue in *Hill*.

68. Like the Sidewalk Counseling Ban, the law in *Hill* made it unlawful, within 100 feet of an abortion-clinic entrance, to "knowingly approach" within eight feet of another person "for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education, or counseling," without that person's consent. Colo. Rev. Stat. § 18-9-122(3).

69. The *Hill* majority held that this law was content-neutral. On the face of the law, whether the consent requirement applied to an approach "depend[ed] entirely on *what* [*the speaker*] *intends to say*" upon accomplishing it. 530 U.S. at 742 (Scalia, J., dissenting). Yet the Court held that it "was not adopted 'because of disagreement with the message'" regulated speakers conveyed, and it could be "justified without reference to the content of regulated speech." *Id.* at 719-20 (majority opinion). It was therefore "content neutral." *Id.* at 725.

70. The Court thus declined to apply strict scrutiny, instead asking whether the law served "significant" government interests and was "narrowly tailored" to accomplishing them. *Id.* at 725-26.

71. The Court held that the law passed this test. The Court said the law served an interest in protecting the "right to avoid unwelcome speech." *Id.* at 716-17. And although the Court recognized the law would "sometimes inhibit a demonstrator whose approach in fact would have proved harmless," this "prophylactic aspect" did not render it not narrowly tailored. *Id.* at 729. Rather, it was "justified" because of the "difficult[y]" characterizing "each individual movement" "within the 8-foot boundary." *Id.*

72. *Hill* was a departure from prior First Amendment precedent, as Justices Scalia and Kennedy explained in separate dissents. The Court had "never held that the universe of content-based regulations" was limited to the categories identified by the majority; instead, laws were also content-based if they facially distinguished based on content. *Id.* 742-43, 746-47 (Scalia, J., dissenting). Nor had the Court ever before "establishe[d] a right to be free from unwelcome expression aired by a fellow citizen

in a traditional public forum." *Id.* at 771 (Kennedy, J., dissenting); *see also id.* at 765 ("The Court's holding contradicts more than a half century of well-established First Amendment principles.").

73. And as the Seventh Circuit has observed, recent Supreme Court decisions have "deeply shaken *Hill*'s foundation." *Price v. City of Chicago*, 915 F.3d 1107, 1119 (7th Cir. 2019).

74. First, in *McCullen v. Coakley*, the Court held that a Massachusetts law forbidding speakers from standing within 35 feet of abortion-clinic entrances violated the First Amendment. 573 U.S. 464 (2014). Explicating the meaning of content neutrality, the Court held that the law "would be content based if it required 'enforcement authorities' to 'examine the content of the message that is conveyed to determine whether' a violation has occurred," *id.* at 479—the precise test for content neutrality the *Hill* majority had rejected, 530 U.S. at 720-21

75. Then, in *Reed v. Town of Gilbert*, the Court held that a city "sign code" violated the First Amendment. 576 U.S. 155 (2015). Citing *Hill*, the lower courts had upheld the sign code on the ground that the city "'did not adopt its regulation of speech because it disagreed with the message [it] conveyed' and its 'interests [were] unrelated to … content.'" *Id.* at 162-63. But citing the *Hill* dissents, *Reed* explained that the focus on "governmental motive" "misunderstand[s]" content neutrality. *Id.* at 166-67 (citing *Hill*, 530 U.S. at 766 (Kennedy, J., dissenting)). Rather, a law is content-based if it "applies to particular speech because of the topic discussed or the idea or message expressed." *Id.* at 163. And "strict scrutiny applies *either* when a law is content based

on its face *or* when the purpose and justification for the law are content based." *Id.* at 166 (emphasis added). That is, "[a] law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech." *Id.* at 165.

76. *McCullen* also undermined *Hill*'s narrow-tailoring holding. While *Hill* had approved the "bright-line prophylactic" nature of the Colorado law, 530 U.S. at 729, *McCullen* reaffirmed the traditional understanding that "the prime objective of the First Amendment is not efficiency," 573 U.S. at 495. Rather, "the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve [its] interests, not simply that the chosen route is easier." *Id.* at 467.

77. In short, "*Hill* is incompatible with current First Amendment doctrine as explained in *Reed* and *McCullen*." *Price*, 915 F.3d at 1117.

78. Indeed, *Hill* is an artifact of an era in which the Court could be criticized for carving out special rules from ordinary constitutional principles to protect abortion and disfavor those who oppose it. *Hill*, 530 U.S. at 741 (Scalia, J., dissenting); *see Dobbs*, 142 S. Ct. at 2276 (citing *Hill* dissents for proposition that abortion has "distorted First Amendment doctrines"). That era is now over. *See generally Dobbs*, 142 S. Ct. 2228. The Sidewalk Counseling Ban violates the First Amendment.

## CLAIMS FOR RELIEF

### Count I

**42 U.S.C. § 1983**
**Violation of U.S. Const. Amend. I: Free Speech Clause**
**Content Discrimination**

79. Under the First Amendment, "a government … 'has no power to restrict expression because of its message, its ideas, its subject matter, or its content.'" *Reed*, 576 U.S. at 163.

80. Thus, "[c]ontent-based laws—those that target speech based on its communicative content—are presumptively unconstitutional." *Id.*

81. There are at least two ways in which a law can be content-based: first, if it "'on its face' draws distinctions based on the message a speaker conveys"; second, if it "cannot be 'justified without reference to the content of the regulated speech' or [was] adopted by the government because of disagreement with the" speech's message. *Id.* (cleaned up). A law that fails either test triggers strict scrutiny.

82. The Sidewalk Counseling Ban is content-based under both tests.

83. First, the Sidewalk Counseling Ban facially distinguishes based on content.

84. A law that defines "regulated speech by its function or purpose" is facially content-based. *Id.* The Sidewalk Counseling Ban does that. It applies only if a speaker approaches "*for the purpose of* passing" material, displaying a sign, or "engaging in oral protest, education, or counseling." Laws of Westchester County § 425.31(*i*) (emphasis added). If the speaker approaches for another purpose, it is permitted.

85. A law is also facially content-based if enforcement authorities must "examine the content of the message that is conveyed to determine whether a violation has occurred." *McCullen*, 573 U.S. at 479 (internal quotation marks omitted). The Sidewalk Counseling Ban requires that. The only way to determine if an approach was

"for the purpose of … protest, education, or counseling" is to examine whether the speaker's message includes protest, education, or counseling.

86. Even if the Sidewalk Counseling Ban were facially content-neutral, it would still be content-based under the second part of *Reed*'s disjunctive test.

87. The interest purportedly justifying laws like the Sidewalk Counseling Ban is protecting abortion-clinic patients from the alleged harms of encountering pro-life speech. But a law is content-based if it is "concerned with [the] undesirable effects" of speech on its audience or "listeners' reactions to speech." *McCullen*, 573 U.S. at 481.

88. The Sidewalk Counseling Ban therefore triggers strict scrutiny—a "demanding standard." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 799 (2011). "It is rare that a regulation restricting speech because of its content will ever be permissible." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 818 (2000).

89. The Sidewalk Counseling Ban cannot survive strict scrutiny.

90. To the extent the interest underlying the Sidewalk Counseling Ban is insulating women entering abortion clinics from hearing pro-life viewpoints, that interest is not even legitimate, much less compelling. In a public forum, the government may not "selectively … shield the public from some kinds of speech on the ground that they are more offensive than others." *McCullen*, 573 U.S. at 477.

91. To the extent the interests underlying the Sidewalk Counseling Ban are protecting access to abortion clinics and guarding against harassment and violence, the ban is not narrowly tailored to achieving those interests.

92. Under *McCullen*, a speech regulation allegedly advancing these interests fails even *intermediate* scrutiny if the government has at its disposal other options aimed at promoting them—such as direct prohibitions on "obstruct[ing] … entry," "injur[ing]" or "intimidat[ing]" patients or workers, and "follow[ing] and harass[ing]" near clinics. 573 U.S. at 490-94.

93. Here, other provisions of the very law containing the Sidewalk Counseling Ban address those interests.

94. In subsections (a)-(h), the law prohibits obstructing access to abortion clinics; violence and any other unwanted physical contact near abortion clinics; following and harassing people near abortion clinics; threats and intimidation of abortion-clinic patients and employees; physically damaging abortion clinics; and "interfer[ing] with" (or attempting to interfere with) an abortion clinic's operations.

95. The federal FACE Act and its New York analogue likewise criminalize obstructing access to abortion clinics, and New York has generally applicable laws forbidding, *inter alia*, assault, harassment, disorderly conduct, and trespass. *See supra* ¶ 63.

96. In light of this multitude of other prohibitions, the only *additional* function served by the Sidewalk Counseling Ban is prohibiting peaceful, non-threatening, non-harassing speech engaged in at the only range at which it is likely to be effective—which strikes "at the heart of the First Amendment." *Schenck v. Pro-Choice Network of W. N.Y.*, 519 U.S. 357, 377 (1997).

97. For the same reasons, even if the Sidewalk Counseling Ban were content-neutral, it would still be unconstitutional, because it is not narrowly tailored to serve significant governmental interests.

98. Although the Supreme Court upheld a materially identical ban on sidewalk counseling in *Hill*, *Hill* is wrongly decided, irreconcilable with *McCullen* and *Reed*, and should be overruled by the Supreme Court.

## PRAYER FOR RELIEF

Wherefore, Plaintiff requests that the Court:

a. Declare that the Sidewalk Counseling Ban, Laws of Westchester County § 425.31(*i*), violates the Free Speech Clause of the First Amendment to the United States Constitution;

b. Issue a permanent injunction prohibiting Defendants, Defendants' agents and employees, and all those acting in concert with Defendants, from enforcing the Sidewalk Counseling Ban, Laws of Westchester County § 425.31(*i*);

c. Issue a permanent injunction prohibiting Defendants, Defendants' agents and employees, and all those acting in concert with Defendants, from penalizing Plaintiff for exercising her First Amendment right to engage in sidewalk counseling at an abortion clinic;

d. Award Plaintiff compensatory damages for the harm suffered as a result of Defendants' deprivation of her constitutional rights;

e. Award Plaintiff reasonable attorneys' fees and costs under 42 U.S.C. § 1988;

f. Award Plaintiff nominal damages;

g. Award such other relief as the Court may deem equitable, just, and proper.

## JURY REQUEST/DEMAND

Plaintiff requests a trial by jury on all issues so triable.

Respectfully submitted this 1st day of November, 2022.

/s/ Daniel M. Vitagliano
Daniel M. Vitagliano*
  S.D.N.Y. Bar No. 5856703
Mark L. Rienzi**
  D.C. Bar No. 494336
Joseph C. Davis**
  D.C. Bar No. 1047629
The Becket Fund for Religious Liberty
  1919 Pennsylvania Ave, N.W.
Suite 400
Washington, D.C. 20006
(202) 955-0095
dvitagliano@becketlaw.org

*Not admitted to the D.C. Bar; admitted to the Bar of the State of New York; practice limited to U.S. courts; supervised by licensed D.C. Bar members

**Applications for admission *pro hac vice* forthcoming